Tiffany R. Norman (SBN: 239873)
TRN LAW ASSOCIATES
654 Sacramento Street, Second Floor
San Francisco, CA 94111
Telephone: (415) 823-4566
Facsimile: (415) 762-5490

Attorney for Plaintiffs Joseph and
Linda Boessenecker

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOSEPH and LINDA BOESSENECKER )<br><br>                      Plaintiff, )<br><br>     vs. )<br><br>JPMORGAN CHASE BANK, )<br><br>      Defendant )<br>_____ ) | **PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>1. VIOLATION OF 12 U.S.C. §2605;<br>2. VIOLATION OF §17200;<br>3. NEGLIGENCE;<br>4. NEGLIGENT INFLICATION OF EMOTIONAL DISTRESS;<br>5. DECLARATORY RELIEF; and<br>6. VIOLATION OF CALIFORNIA ROSENTHAL ACT. |

Plaintiffs were given leave to amend their complaint, and do so for the cause of action of negligence and negligent infliction of emotional distress. Plaintiffs will not amend the cause of action for intentional infliction of emotional distress.

### INTRODUCTION

Plaintiffs Joseph and Linda Boessenecker ("Plaintiffs") seek declaratory relief to secure a proper accounting for all of their past payments on their mortgage loans.  Defendant JPMorgan Chase Bank, the mortgage servicer, has ignored Plaintiffs' qualified written requests to this end. This has stalled Plaintiffs ability to refinance their property, made them spend time, effort, and

money to get this information and file this suit. Therefore, Plaintiffs also seek damages under the Real Estate Settlement Procedures Act.[1]

**THE PARTIES**

1. At all times relevant herein, Plaintiffs were over the age of eighteen and is and are residents and owners of 1006 Eve Lane, Livermore, Alameda County, California 94550 (hereinafter "Subject Property").

2. On information and belief, Defendant JPMorgan Chase, N.A., (hereinafter "Chase") is registered to do business in California, with the agent of service of process CT Corporation System, 818 West Seventh Street, Suite 200, Los Angeles, CA 90017.

**JURISDICTION AND VENUE**

3. Because Plaintiffs claims arise under the laws of the United States this Court has jurisdiction over this matter.[2]

4. Because the Northern District of California, San Francisco Division, is the judicial district and division in which the property that is the subject of the action is situated, where a substantial part of the events or omissions giving rise to the claims occurred and where the Plaintiffs reside, venue is proper.[3]

5. This Court's exercise of personal jurisdiction over Chase would not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution because Defendant purposefully established minimum contacts in California such that the maintenance of this action does not offend traditional notions of fair play and substantial justice.[4]

---

[1] 12 U.S.C. § 2605(e) and (f)

[2] The district courts of the United States have original jurisdiction over all civil actions that arise under the laws of the United States. 28 U.S.C. § 1331.

[3] 28 U.S.C. § 1391(b); NDLR 3.1 B(1) – (3)

[4] *E.g., Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

PLAINTIFFS' FIRST AMENDED COMPLAINT

**THE FACTS**

6.  This action relates to Plaintiffs' Subject Property which is described as follows: LOT 37, TRACT 6561, FILED JANUARY 28, 1994, MAP BOOK 210, PAGES 81-85, ALAMEDA COUNTY RECORDS. (See Exhibit A)

7.  Plaintiffs purchased the Subject Property by entering into a Deed of Trust on or about August 3, 2007.  (See Exhibit B)

8.  Plaintiffs were contacted on October 15, 2009, by Brian Turnbull at Chase regarding a refinancing of their loan. Chase originally carried their loan. Before being contacted, Plaintiffs were not thinking about refinancing. Mr. Turnbull stated Plaintiffs could get a better rate on their loan. Plaintiffs worked with Mr. Turnbull, then with Natasha Glover from October 2009 to April 2010 to get the refinanced loan.

9.  On April 14, 2010 the new loan documents were signed.  Plaintiffs paid the residual agreed to amounts and closed out the initial loan.

10. On April 27, 2010, they received a letter from Chase that the loan was paid in full on April 20, 2010. (See Exhibit C)

11. A few months later, Channell More at Chase sent a letter dated July 9, 2010, which stated that Plaintiffs owed $5,176.00 due to "shortage" in pay off amount. (See Exhibit D) Plaintiffs, being confused by the two contradictory letters, called and left messages for Mr. Turnbull, and sent him an email on July 27th. Plaintiffs explained that they did not understand how there could be a shortage when Chase handled the first transaction, and the refinance of the loan, and the amount didn't even correlate with the refinance and final transaction on the prior loan. (See Exhibit E) Plaintiffs asked for an explanation.

12. Mr. Turnbull replied on July 28, 2010, stating he was passing the file onto a manager and on August 2, 2010, Plaintiffs emailed Ms. Goode asking her to confirm their loan was paid in full and that they did not have an outstanding balance. (See Exhibit F)

13. Plaintiffs emailed Ms. Goode again on August 3rd asking her to confirm the loan was paid in full. (See Exhibit G)

14. On August 3, 2010, Plaintiffs received an email from Ms. Goode which stated her records showed the loan was paid in full, but she was hesitant to confirm that until she had the opportunity to review the letter they received. She wanted to make sure the department was not billing them for something. (See Exhibit H)

15. Plaintiff thanked Ms. Goode and stated he believed all monies were handled correctly. "Please help us wrap this up as quickly as possible. (See Exhibit I)

16. On August 4, 2010, Ms. Goode sent an email stating that she was working with Chanell, the person that sent the letter, to resolve the matter and:

> So far she has told me that although the account shows paid in full now, that will be reversed in a few weeks if payment is not remitted. The concern I have at this point pertains to an <u>internal issue regarding the payoff amount that we confirmed during the refinancing</u>. I will keep you posted with updates as I get them, but do not be alarmed. You will not be negatively impacted. (Emphasis added) (See Exhibit J)

17. On August 11, 2010, Plaintiffs sent an email stating they would "appreciate an update, and closure to this." (See Exhibit K)

18. After several days passed, Plaintiffs attempted to contact Ms. Goode, but received an out of office reply which stated she would return on August 22, 2010.

19. On September 26, 2010, Plaintiffs received a letter from Chase dated August 26, 2012, stating the payoff in March was short by $3,672.81.

20. Thus, Plaintiffs had received three letters. One stated the loan was paid in full. The next letter stated they owed $5,176.00. The last letter stated they owed $3,672.81.

21. On September 7, 2010, Plaintiffs, who were frustrated and confused about if they owed any money, and if so, how much, sent an email to Ms. Goode asking again to have the payoff amount clarified.  They reminded Ms. Goode that they sent an email on August 11, 2010, requesting an accounting, yet never received a response. Further, that no one from Chase appeared to be speaking with each other thus nearly one year after trying to refinance the loan, they still did not have any closure on the refinancing that took six months. (See Exhibit N)

22. Plaintiffs sent the three contradictory letters to Ms. Goode, and the letter that the loan was paid in full. Plaintiffs demanded a full reconciliation of the entire transaction, "including dates, payoffs, loan amounts, closing fees, costs, transfers and checks distributed." Plaintiff Mr. Boessenecker explained he could not understand Chase and their accounting. (See Exhibit C, D, M)

23. On September 8th, emails were exchanged between Plaintiffs and Ms. Goode. In the first email Ms. Goode stated that there were two separate issues, which was why they received two separate letters. The first issue dealt with an insurance disbursement [for $5,176.81]. The second letter dealt with a tax disbursement [$3,672.81]. The first issue was resolved, and the second issue was pending, which dealt with the tax department overpaying the county. Since Chase overpaid on Plaintiffs' taxes, they were waiting for a refund. (See Exhibit O)

24. Plaintiffs replied to Ms. Goode's email stating they appreciated her looking into the matter but they needed the issue resolved so they could get on with their lives. Further, that they were holding off on spending any money until the issue was resolved, thus the sooner Chase could get the issue resolved, the better. (See Exhibit P)

25. Ms. Goode sent a second email on September 8th. She stated it took a couple of months for the county to return the taxes that Chase overpaid. Also that eventually they would get the money back, even if Chase took money from Plaintiffs escrow account, and it caused the escrow to go short,

(which would impact your monthly payment) eventually the money will be back in your escrow account and you would no longer be short. If the money is taken out of your escrow account, you will be required to increase your monthly payment in order to recover the escrow shortage. *To combat that I will request a temporary payment change, which will prevent your monthly payment from changing. I will make this request every month on your behalf until the money is returned.* Again, you can choose to not spend the extra money your family has in preparation for this event; however, I assure you I will take care of it and you will not have to come out of pocket any more money.  (Emphasis added) (See Exhibit Q)

26. Thus, even though it was Chase's mistake that they overpaid on Plaintiffs' taxes, it was possible that Plaintiffs would have their payments increase due to the mistake by Chase.

27. Plaintiffs sent a follow up email on September 9, 2010. Plaintiffs asked for a written dismissal of the $5,176.81 amount Ms. Goode referenced in her email on the previous day, September 8th. Since Ms. Goode stated the first issue was resolved, they wanted this in writing so they were not asked to pay that amount at a later date. Further, Plaintiffs stated that it had now appeared the county was paid property taxes twice. Plaintiffs explained that they should not be penalized for Chase's oversight on the property taxes. Once again Plaintiffs requested a reconciliation and closure of the issue so they did not have any exposure. (See Exhibit R)

28. However, Plaintiffs received nothing from Ms. Good. In fact, no further communication occurred for several months until Plaintiffs received a letter dated May 2, 2011, regarding an increase in payment.  The letter stated the mortgage payments were increasing by $465.00 due to an "impound shortage." Plaintiffs called Ms. Goode, who forwarded them to Zeresh Brooks, in the loan servicing department. Mr. Brooks stated the increase was due to a "shortage in the escrow account" however that their taxes and insurance "have not gone up." Mr. Brooks promised to send an email regarding why there was a shortage of $5,579.17. However, he never did so. Plaintiffs asked to speak to a manager and were forwarded to Vivian Blow.  Although Plaintiffs left voicemail messages, they didn't hear back from her.

29. On May 9, 2011, Plaintiffs still had not received a response, thus once again attempted to contact Ms. Blow. Her message stated she was out of the office and to call Roland Wills. Plaintiffs did so. They left him two voicemail messages.

30. On May 16, 2011, Plaintiffs received a call from Mr. Willis.  Plaintiffs explained the history of the loan and Mr. Willis assured Plaintiffs that he would speak to Ms. Goode, research the account and get back to them.

31. On May 17, 2011 Plaintiffs again contact Ms. Goode. They explain that they never did receive an account reconciliation that they repetitively requested. Thus, the issue "raised its ugly head yet again this year." (See Exhibit T) Also that Mr. Willis from Chase would be contacting her to try and research why Plaintiffs had to spend over $1,000.00 in increased payments since the beginning of the year. Further, if they would have paid attention to their original request, it would have been much easier. (See Exhibit T)

32. Instead of dealing with the issue, on May 18th Ms. Goode replied that she did not work in servicing and would only speak with Plaintiffs, on information and belief Ms. Goode did not want to speak with Mr. Willis, not understanding he also worked at Chase. (See Exhibit U) Plaintiffs replied explaining that Mr. Willis was a supervisor at Chase, and was contacted because Plaintiffs never received a written reconciliation regarding their account which was originally requested in July 2010.  (See Exhibit V)

33. Instead of assisting Plaintiffs, Ms. Goode stated to "conduct all your future communication with the servicing department and/or Roland [Willis]." (See ExhibitW)

34. Plaintiffs try to contact Mr. Willis for a week and did not hear back from him. On May 24th, they called him again and spoke with him about the loan. He stated he would follow up with the Tax Department and work to resolve the issue. He believed the amount increased because Chase had double paid the taxes without having received a tax credit. (This was the issue that Ms. Goode said was resolved in her email on September 8, 2010, referenced above.) Mr. Willis promised to call Plaintiffs on the 26th, however never did so.

35. Plaintiffs again try to contact Mr. Willis. On June 7th they leave him another voicemail message, however he never replied. Plaintiffs, having no further information on their account, and receiving no assistance from Chase, continued to make their increased monthly mortgage payments to avoid credit problems.

36. During the time Plaintiffs were trying to determine what was happening with their loan, the interest rates reached a historic low. Plaintiffs wanted to refinance their loan to

capture these low rates and reduce their monthly payments, but could not understand what was happening with the loan so did not do so.

37. Approximately one year later, after Plaintiff in good faith paid the increased mortgage amounts, on May 22, 2012, Plaintiffs received a phone call from Chase stating that their monthly mortgage payment was now decreasing by $320.80 per month. Plaintiff explained that since the refinance the account had been a mess, and requested a reconciliation of his account. Once again he does not receive a reconciliation.

38. Since Plaintiffs could not get any answers regarding their loan, and wanted to refinance their loan to take advantage of the historically low interest rates, they hired legal counsel to prepare a Qualified Written Request regarding their loans. A letter was sent to Chase requesting, among other things, a payment history on their original loan. In a letter dated August 16, 2012, but received later, Chase acknowledged receiving the letter, but requested an authorization in order to provide the information to their legal counsel. (See Exhibit X)

39. Plaintiffs faxed an authorization to Chase on September 6, 2012 in order for them to release the information requested in the QWR.

40. Plaintiffs received another letter dated September 11, 2012, requesting an authorization, although one was already sent. Again Plaintiffs faxed an authorization.

41. On October 8, 2012, Plaintiffs' counsel sent a second letter to Defendant. She explained that On August 6, 2012 a QWR was sent:

> This letter was sent regarding the amount that is owed on client's loan, for address 1006 Eve Lane, Livermore, CA 94550. After receiving the letter, Chase sent my client's an authorization request, dated August 16, 2012. My clients sent an authorization by facsimile dated September 6, 2012, which included authorization to provide documentation to my firm, and specifically to myself. On September 11, 2012, another letter was prepared and sent by Chase. This letter stated the request did not provide all of the information for Chase to process the request, however, the letter did not state what was missing. The authorization was identical to the authorization in the August 16 letter, however, the address and fax number to send the authorization was different.

I am providing the original authorization, which is the same as the second request for an authorization.  See attached. In addition, see the original request listed below.

42. Thus, Plaintiffs sent two QWR's for their original loan.

43. On October 29, 2012, Plaintiffs received a reply regarding their first loan.  (See Exhibit Z) However, even though Plaintiffs requested a payment history showing the principal amount owed, the interest owed, and the escrow, Chase did not send this information. In fact the only time in their "Detailed Transaction History" that Chase stated the balance owed was $609,822.45, which was on April 20, 2010.

44. In order to get information on the refinanced loan, Plaintiffs, through their counsel, sent another Qualified Written Request on November 20, 2012. Plaintiffs sent this letter by certified mail. (See Exhibit AA)

45. Chase sent two letters to Plaintiffs dated November 19, 2012. The first stated they had received the authorization to speak to their attorney regarding the refinanced loan. (See Exhibit BB)

46.  On November 23, 2012, Debrina Roody signed for the letter. (See Exhibit CC)

47. Although Chase sent a letter stating they had the attorney authorization, and Chase sent a letter that they were looking into the matter, and Debrina Roody signed for the letter, Plaintiffs received no response whatsoever from this letter.

48. To date Plaintiffs have not received a response regarding their refinanced loan. Plaintiffs have received no closure regarding whether or not their loan is paid in full, or if they owe any money, why their payments increased, then decreased.

49. Plaintiffs have spent countless hours trying to determine what was happening with their loans. Plaintiffs have spent, and will continue to spend, time, effort and money hiring an attorney to determine what is happening with the payment history, how much they owe, and what their monthly mortgage payments should in fact be.

50. Plaintiffs, having received no clarity, have not been able to refinance their loan to take advantage of the low interest rates and save thousands per year on their mortgage payments.

## FIRST CAUSE OF ACTION
## RESPA VIOLATION-12 U.S.C. §2605

51. Plaintiffs hereby reincorporate by reference all previous allegations as though fully set forth herein.

52. Plaintiffs' loans are "federally-related mortgage loans" as such term is defined under 12 U.S.C. 2602.

53. Chase is therefore a servicer of a federally-related mortgage loan within the meaning of RESPA, 12 U.S.C. § 2605. Plaintiffs tried to get information on their loans for two years, since they were not able to do so, they were forced to hire an attorney.

54. On August 6, 2012, Plaintiffs counsel, on behalf of plaintiffs, sent a QWR as per the RESPA, 12 U.S.C. § 2605 (e)(2), and Chase as the servicer of the loan should have responded to the letter within 30 days per the time mandated by Congress in "Subtitle 'E' Mortgage Servicing" of the "Dodd-Frank Wall Street Reform and Consumer Protection Act" and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1). Plaintiffs clearly stated specifically what they were requesting from Chase for their original loan.  (See Exhibit DD).

55. However, Chase did not provide the requested information for their original loan. Chase only provided some information, but not all. By failing to provide the requested information, Chase violated RESPA §2605(e)(2).

56. On November 19, 2012, Plaintiffs counsel, on behalf of Plaintiffs, sent a QWR per RESPA, 12 U.S.C. 2605 (e), and Chase, as the servicer of the loan, should have responded to the letter within 30 days per the time mandated by Congress in "Subtitle 'E' Mortgage Servicing" of the "Dodd-Frank Wall Street Reform and Consumer Protection Act" and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1).

Plaintiffs explained in their letter that they refinanced their loan on April 24, 2010, and since that time had received conflicting information about the amount owed on their loan. Further to determine what was happening with their loan, they needed information on their payment history, including other information.  (See Exhibit AA)

57. Although Chase acknowledged receiving the letter on November 23, 2012, by signing for the letter, to date Chase has not responded to the letter. (See Exhibit CC)

58. When Chase did not respond to the letter and provide the requested information it violated RESPA § 2605(e).

59. Plaintiffs have been damaged by Chase's failure to respond to their QWR.

60. Plaintiffs' damages include attorney's fees, lost time, aggravation, emotional and physical stress.

61. Plaintiffs are entitled to a private right of action and an award of damages from Chase under 12 U.S.C. § 2605(f).

62. Plaintiffs are entitled to recover actual damages sustained, statutory damages of $2,000.00 per non-response of the QWR, thus $4,000.00, costs and reasonable attorney's fees.[5]

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CAUSE OF ACTION**
**Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, et. seq.**
**"Unlawful," "Unfair" and "Fraudulent" Business Acts or Practices**

63. Plaintiffs hereby reincorporate by reference all previous allegations as though fully set forth herein.

---

[5] 12 U.S.C. §2605(f)(1) and (f)(3). Dodd-Frank raised the statutory figure from $1,000.00 to $2,000.00. Pub.L. 111-203 §1463(b). this provision went into effect on July 22, 2010. Pub. L. 111-203 §4. But cf Pub. L. 111-203 §400(c)(3) (statutory provisions requiring implementation of regulations for their effectiveness).

**VIOLATION OF LAW**

64. Plaintiffs tried to get information on their loans for two years, since they were not able to do so, they were forced to hire an attorney.  On August 6, 2012, Plaintiffs counsel, on behalf of Plaintiffs, sent a QWR as per RESPA, 12 U.S.C. 2605 (e), and Chase as the servicer of the loan should have responded to the letter within 30 days per the time mandated by Congress in "Subtitle 'E' Mortgage Servicing" of the "Dodd-Frank Wall Street Reform and Consumer Protection Act" and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1). Plaintiffs clearly stated specifically what they were requesting from Chase for their original loan.  A true and correct copy of the letter is attached as Exhibit DD hereto and its contents are incorporated by reference.

65. However, Chase did not provide the requested information for their original loan. Chase only provided some information, but not all. By failing to provide the requested information, Chase violated RESPA § 2605(e).

66. On November 19, 2012, Plaintiffs counsel, on behalf of Plaintiffs, sent a QWR as per RESPA, 12 U.S.C. 2605 (e), and Chase, as the servicer of the loan, should have responded to the letter within 30 days per the time mandated by Congress in "Subtitle 'E' Mortgage Servicing" of the "Dodd-Frank Wall Street Reform and Consumer Protection Act" and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1). Plaintiffs explained in their letter that they refinanced their loan on April 24, 2010, and since that time had received conflicting information about the amount owed on their loan. Further to determine what was happening with their loan, they needed information on their payment history, including other information.  A true and correct copy of the letter is attached as Exhibit AA hereto and its contents are incorporated by reference.

67. When Chase did not respond to the letter and provide the requested information it violated RESPA 2605(e).  It is a violation of California state law, specifically Business and Professions Code § 17200, to violate any law - state or federal, and Plaintiffs are entitled to treble damages and attorney's fees.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

68. Plaintiffs hereby incorporate by reference each and every one of the preceding paragraphs as if the same were fully set forth herein. Plaintiffs received a loan, were told the amount owed changed, several times, were told to pay more money on the loan, then less money, and when Plaintiffs asked Defendant several times to explain the amount owed, they were never told.  Plaintiffs tried to determine what was owed informally, by email, and through legal means, by sending Qualified Written Requests (QWR), which states a loan servicer has a "duty"[6] to respond to borrower inquiries.  Defendants did not do so, and thus, were in violation of RESPA. In refusing to do so, they acted negligently.

69. The elements of a negligence cause of action are (1) the existence of a duty to exercise due care, (2) breach of that duty, (3) causation, and (4) damages.

70.  Here, Defendant had a duty of care to Plaintiffs. A case often cited to regarding duty of care is *Nymark v. Heart Federal Savings and Loan Assn.,* 231 Cal.App.3d 1089, 1096 (1991), stating "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." *Id.* at 56.

71. However, this is not prevailing case law regarding a duty. In *Jolley v. Chase Home Finance, LLC.* No. A134019, the appellant took out a construction loan with Chase, and relied on Chase's representations that it would modify his loan and adjust his disbursements. He relied on Chase's assurances and borrowed money from friends and relatives to finish construction.

72. The court stated in *Jolley* that the issue of whether Defendant owes a duty of reasonable care is a "triable issue of material fact." *Id.* p. 26.  The fact pattern in *Jolley* was similar as it is here. There, the court looked at a duty of care in the context of the cause of action

---

[6] 12 U.S.C.A. § 2605 defines the "[d]uty of loan servicer to respond to borrower inquiries."

of negligence. The court acknowledged that "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." (citing to *Nymark v. Heart Fed. Sav. & Loan Ass'n* (1991) 231 Cal. App. 3d 1089, 1095-96) The court emphasized that "courts should not rely mechanically on the 'general rule' that lenders owe no duty of care to their borrowers." *Id.* at 33. The court arrived at that conclusion after quoting extensively from recent legislative enactments to show that "the California Legislature has expressed a strong preference for fostering more cooperative relations between lenders and borrowers." *Id.* at 32.

73. To determine if there was a duty of care, the court in *Jolley* cited to what it called the six *Biakanja* factors, (which were also discussed in *Knox v. Ameriquest Mortgage Co.*, No. C 05 00240 SC, 2005 WL 1910927, *5 (N.D. Cal. Aug. 10, 2005))which are:

> 1) the extent to which the transaction was intended to affect the plaintiff, 2) the foreseeability of harm to him, 3) the degree of certainty that the plaintiff suffered injury, 4) the closeness of the connection between the defendant's conduct and the injury suffered, 5) the moral blame attached to the defendant's conduct, and 6) the policy of preventing future harm. *Knox v. Ameriquest*, *5 (*quoting Nymark v. Heart Fed. Savings & Loan Ass'n,* 231 Cal. App. 3d 1089, 1098 (1991)). Not all of these factors need to be met for a duty of care to be present and, in *Knox*, the fifth factor alone was sufficient to establish a duty of care. *Id.*

74. In the instant case, Plaintiffs' counsel sent Defendant a QWR stating "[m]y clients refinanced their home with Chase on April 24, 2010, and since then they have received conflicting information about the amount owed on the loan. In order to determine what is happening with this loan, I am requesting the following information..." However, this information was not fully provided in one letter, as for the second letter, it was ignored.

75. Applying the Biakanja factors Defendant owed them a duty of care to reply to the QWR because,: 1. The QWR was regarding Plaintiffs loan; 2. It was foreseeable if Defendants did not respond to the QWR, Plaintiffs would continue to be in the dark with what was happening with their loan; 3. The QWR stated that for over two years they were receiving conflicting information, and were trying to determine what was happening with their loan, there was a degree of certainty that if this information was not provided, they would continue to suffer injury by being in the dark; 4. There was a close connection between Defendant not providing the information requested in the QWR and Plaintiffs not knowing what they owed; 5. A law was created to force servicers to provide this information when requested by their borrowers, not doing so is morally blameworthy; 6. There is a policy of preventing future harm to other borrowers, if they request information from their servicer on their loan, it legally should be provided.

76. Thus, there was a duty of care, Defendant breached that duty, which makes them negligent, and lead to them violating RESPA. It caused Plaintiffs damages, and is to this day causing Plaintiffs', who still have no information on their loan, damages.

## FOURTH CAUSE OF ACTION
## NEGLIGENT INFLICATION OF EMOTIONAL DISTRESS

77. Plaintiffs hereby reincorporate by reference all previous allegations as though fully set forth herein.

78. As stated above in the cause of action for negligence, Chase owed Plaintiffs the exercise duty of due care to properly service Plaintiffs' loan and be honest with Plaintiffs about the amount owed on the loan and their monthly mortgage payments.  Chase was in a position of authority and uneven bargaining power and was required to provide Plaintiff with the necessary information that would allow Plaintiff to make prudent and beneficial decisions regarding their loan, and to give them the ability to refinance their loan.

79. Plaintiff Mr. Boessenecker has been under severe stress due to the behavior of Chase, from being told: 1. Their loan was paid off; 2. They were short and owed over $5,000.00;

3. They were short and owed over $3,000.00; 4. Their payments were increasing by over $400.00 per month; and 5. Their payments were decreasing by over $300.00 per month, that he has seen his doctor several times complaining of stress. Mr. Boessenecker, an executive and engineer, is a well organized individual, and understands numbers. Yet, he has not been able to make sense of these numbers.  At this time he cannot be certain of his loan balance.

80. Chase knew, or should have known, that their failure to exercise due care in the performance of the servicing would cause Plaintiff severe emotional distress. In fact, Plaintiff explained to Chase on several occasions how much stress this was causing him, and how Plaintiffs were not taking vacations since they were waiting to hear from Chase regarding their loan. (See Exhibit N)  Further, they were not spending any money in case they had to pay for the amount requested in the letters discussing a shortage in the impound account, and/or escrow account. (See Exhibit P)

81. Chase failed to provide the reasonable care required of them as a servicer.  Chase failed to adequately disclose material information to Plaintiffs regarding the payments on their loan, their payment history, and if in fact there was a shortage in the accounts. When Plaintiffs requested this information several times over a two year span, Chase continuously failed to provide this information. By doing so they failed to accurately apprise Plaintiffs of information that may have placed Plaintiffs in a far better position by refinancing the loan at the historic low interest rates.  Thus, Plaintiffs have suffered stress and economic loss.

82. As a proximate result of Chase's conduct, Plaintiffs have suffered and continue to suffer from severe emotional distress.

83. As a further proximate result of Chase's conduct and the consequences proximately caused by it, as they herein above alleged, Plaintiffs suffered severe humiliation, mental anguish, and emotional, physical and economic distress, and they have been injured in mind and body.

84. Plaintiffs' damages include general damages, special damages and increased out of pocket costs.

85. In addition, Plaintiffs' home loan with Chase contains clauses allowing the prevailing party to recover their attorney's fees and costs.  Plaintiffs were forced by the acts of Defendant to bring this action, therefore entitling them to their attorney's fees and costs under the tort of another doctrine.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTH CAUSE OF ACTION
## DECLARATORY RELIEF

86. Plaintiffs hereby reincorporate by reference all previous allegations as though fully set forth herein.

87. There exists an actual controversy between the parties requiring the declaration of the rights of parties to this action. (28 U.S.C. §2201(a))

88. An actual controversy has arisen and now exists between Plaintiffs and Defendant regarding their respective rights and duties concerning the status and validity of the loan and Promissory Note, the Deed of Trust, loan servicers.

89. A judicial declaration is necessary and appropriate at this time and, under these circumstances in order that the Plaintiffs may ascertain their rights and duties.

90. As a result of the actions of Defendant, Plaintiffs has suffered damages according to proof and seeks Declaratory Relief that Defendant owe Plaintiffs for all reasonable attorney's fees and costs in bringing this suit.

91. Defendants' actions in this matter have been willful and knowing.

WHEREFORE, Plaintiffs prays for relief as set forth below.

## SIXTH CAUSE OF ACTION
## CALIFORNIA ROSENTHAL ACT

92. Plaintiffs hereby reincorporate by reference all previous allegations as though fully set forth herein.

PLAINTIFFS' FIRST AMENDED COMPLAINT

93. This is a "Consumer debt" as defined in Civil Code §1788.2 in that money is due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction.

94. Defendant is engaged in debt collection. The Rosenthal Act defines a debt collector as any person who "in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." CAL. CIV. CODE § 1788.2(c). A debt collection is defined as "any practice in connection with the collection of consumer debts." *Id.* § 1788.2(b).

95. Plaintiffs allege that Defendant regularly attempted to collect money from consumers of California who owe money to Defendant or owe money to other entities for which Defendant collects money. Defendant was attempting to collect money from Plaintiffs for their residence.

96. Defendant's actions constitute a violation of the Rosenthal Act in that they threatened to take actions not permitted by law, including but not limited to: falsely stating the amount of a debt; increasing the amount of a debt by including amounts that are not permitted by law or contract; and using unfair and unconscionable means in an attempt to collect a debt. As a direct result of said violations, Plaintiffs are entitled to statutory damages according to the determination of this Court, actual damages and costs according to proof and reasonable attorney's fees.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### III.   PRAYER FOR RELIEF

A. For actual damages according to proof;

B. For compensatory damages as permitted by law;

C. For statutory damages as permitted by law;

D. For punitive damages as permitted by law;

F. For equitable relief, including restitution;

H. For interest as permitted by law;

I. For declaratory relief;

J. For injunctive relief;

K. For reasonable attorneys' fees and costs; and

L. For such other relief as is just and proper.


October 24, 2013                                    /S/ Tiffany R. Norman
                                                   Tiffany R. Norman
                                                   Attorney for Plaintiffs

PLAINTIFFS' FIRST AMENDED COMPLAIT